SARAH M. STUPPI, CAL. BAR NO. 103041
LAW OFFICES OF STUPPI & STUPPI
1630 North Main Street, Suite 332
Walnut Creek, CA 94596
Telephone: (415) 786-4365
E-mail: Sarah@stuppilaw.com
Attorneys for the Debtor and Debtor-in-Possession

UNITED STATES BANKRUPTCY COURT

NORTHERN DISTRICT OF CALIFORNIA

(SAN FRANCISCO DIVISION)

In re:

SAN FRANCISCO CARE CENTER, LP, a California limited partnership,

    Debtor.

Case No. 25-30025-DM

Chapter 11

**DEBTOR'S OBJECTION TO THE APPOINTMENT OF A PATIENT CARE OMBUDSMAN [11 U.S.C. § 333(a)]**

Date: February 14, 2025
Time: 1:30 p.m. PST
Place: ZOOM webinar
Judge: The Honorable Dennis Montali

SAN FRANCISCO CARE CENTER, LP, debtor and debtor-in-possession in the above-referenced Chapter 11 case (the "Debtor"), hereby objects to the appointment of a patient care ombudsman in the above-captioned matter, as follows:

**I. STATEMENT OF FACTS**

The Debtor filed a petition for relief under chapter 11 of the Bankruptcy Code on January 14, 2025 ("Petition Date"). Since 2004, the Debtor has owned and operated an assisted living and memory care facility for elderly patients, ranging in age from 80 to 100 years old. The Debtor's facility is located at 1035 Van Ness Avenue, San Francisco, CA 94109 (the "Facility"). The Debtor provides services to assist residents with daily activities such as feeding, bathing, dressing, medication management, toileting and mobility support. The Facility does not provide medical

services and technically does not have "patients", but residents that live at the Facility. At present, there are fifteen (15) residents living in the Facility.

The Debtor does not dispute that the Facility's operations are within the definition of a "health care business" in accordance with 11 U.S.C. §101(27)(B). However, the Debtor contends that the appointment of a "patient" care ombudsman is unnecessary under the specific facts and circumstances of this case. As set forth in detail below and in the accompanying Declaration of the Teresa Wong (the "Wong Declaration"), the Debtor's Designated Responsible Individual, the Debtor has an impeccable record for assisted living/resident care. The Facility is heavily regulated and monitored by the Community Care Licensing Division of the California Department of Social Services ("CDSS") and, most notably, the Long-Term Care Ombudsman Program by the California Department of Aging ("CDA").[1] These government agencies routinely conduct unannounced visits; the CDSS performs **annual** inspections, most recently on November 26, 2024, and the CDA conducts unannounced **quarterly** inspections, most recently on December 26, 2024. The Facility also has internal practices and procedures to safeguard resident care. At present there are 15 care providers (including direct care staff) for the 15 residents. The Debtor submits that the appointment of an ombudsman is redundant and would "merely add another layer of bureaucracy to an already regulated and supervised" entity. *In re Alternate Family Care,* 377 B.R. 754 (Bankr. D. Fla.2007).

## II. ARGUMENT

A. <u>The Appointment of a Patient Care Ombudsman is Unnecessary Pursuant to Section 333(a) of the Bankruptcy Code and Applicable Case Law</u>

The appointment of a patient care ombudsman is mandated by section 333 (a)(1) of the Bankruptcy Code in a health care business bankruptcy case "unless the court finds that the appointment of such ombudsman is not necessary for the protection of patients under the specific

---

[1] Section 333 (a)(2)(B) of the Bankruptcy Code provide that, in a long-term care facility such as the Debtor's business, the "United States trustee may appoint a State Long-Term Care Ombudsman appointed under the Older Americans Act of 1965 for the State in which the case is pending…". **The CDA has already appointed a Long-Term Care Ombudsman to supervise and monitor the Debtor's facility.**

facts of the case." Bankruptcy courts have identified nine (9) non-exclusive factors to determine whether an ombudsman is necessary, specifically: (1) the cause of the bankruptcy; (2) the presence and role of licensing or supervising entities; (3) Debtor's past history of patient care; (4) the ability of patients to protect their rights; (5) the level of dependency of the patients on the facility; (6) the likelihood of tension between the interests of the patients and the debtor; (7) the potential injury to the patients if the debtor drastically reduced its level of patient care; (8) the presence and sufficiency of internal safe guards to ensure the appropriate of care; and (9) the impact of the cost of an ombudsman on the likelihood of a successful reorganization. *In re Alternate Family Care* at 758; *In re Valley Health System*, 381 B.R. 756 (Bankr. C.D. Cal. 2008). Below is a summary of the Debtor's operations in light of the factors recited above:

     **(i) Cause of the Bankruptcy**. In or about 2017, the Debtor was wrongfully sued by the City of San Francisco for, <u>inter alia</u>, building code violations. That litigation continued until 2023. Although the Debtor prevailed, the exorbitant legal fees associated with defending this legal action, coupled with the COVID pandemic, strained the Debtor's finances. In or about March 2024, the Debtor was unable to pay its mortgage payments to its lender, Lenox Mortgage IX, LLC ("Lenox"). Despite unsuccessful efforts to negotiate a forbearance agreement with Lenox, a notice of default was recorded on or about September 2024, and a subsequent foreclosure sale was scheduled for January 14, 2025. In order to protect the equity in the Property for the benefit of creditors, the Debtor filed this bankruptcy case. As set forth in the Wong Declaration, there were <u>no allegations</u> of deficient care or privacy concerns that precipitated the filing of this bankruptcy case.

     **(ii) The Presence and Role of Licensing or Supervising Entities.** CDSS conducts unannounced annual inspections of the Facility's resident rooms, common areas, kitchen, food storage, fire safety, medication storage, record keeping, staff engagement with residents, temperature comfort levels, etc. As noted above, CDSS's most recent visit was on November 26, 2024. Attached to the Wong Declaration as Exhibit "A" is the Facility Evaluation Report prepared by the assigned Licensing Program Analyst ("LPA") from the CDSS, which reflects a favorable inspection with "no deficiencies" cited. Additional inspections are required if deficiencies are

found. Should there be any complaints levied against the Facility, the San Bruno Regional Office of the Community Care Licensing Division will dispatch LPAs to conduct unannounced on-site complaint inspections regarding any allegations of misconduct by the Facility. Citations are issued if the complaints are substantiated, and LPAs will continue to supervise until the issue is corrected.

CDA conducts, at a minimum, quarterly unannounced visits (most recently on December 26, 2024) to observe the Facility's day-to-day residential care.[2] During their visits, the CDA Ombudsman representatives: (a) review and copy the resident roster; (b) thoroughly inspect common areas and resident rooms; and (c) interview residents to inquire about their satisfaction with their care. Additionally, the Facility is required to display posters listing the phone numbers of the local Long-Term Ombudsman office and the Statewide CRISIS line in visible public areas. All residents and their representatives are invited to call and/or file complaints against the Facility should there be violations of resident's privacy and personal rights, concerns with their quality of care, or suspicion of physical, verbal, mental or financial abuse, etc. If necessary, the CDA Ombudsman representatives will visit the Facility to investigate the claims.

In addition, the Facility is also under supervision and operates under the guidelines of the California Department of Public Health and San Francisco Department of Public Health for communicable disease control, such as HIV/AIDS, tuberculosis, and COVID-19, etc.

**(iii) Debtor's Past History of Patient Care/ the Presence and Sufficiency of Internal Safeguards to Ensure the Appropriate Care/ Ability of Patents to Protect their Rights/Likelihood of Tensions Between the Patients and the Debtor.** As set forth in the Wong Declaration, the Debtor has been in operation for 20 years, and no action has bever been taken by any federal, state, or local regulatory authority due to deficiencies in resident care, either prior to or after the Petition Date. The Debtor also has internal procedures for grievances and complaint. The Facility has a policy to have hands-on supervisors present 24/7 to assist and resolve any

---

[2] During the December 26 visit, the two CDA Ombudsman representatives found the Facility's resident care to be exemplary.

issues. Should residents or their representatives have any concerns about the quality of the services they are receiving or about their accommodations, they can them bring to the Resident Care Coordinator or Administrator directly, or submit a Grievance or Complaint Form, a copy of which is attached to the Wong Declaration as Exhibit B.

**(iv) Level of Dependency of Patients in Facility/Potential Injury to Patients if Debtor Drastically Reduced its Level of Patient Care**

The Facility does not provide medical care, but the residents depend upon the Facility to assist with their daily living needs, safety and care. As a result, there is a high level of dependency that residents rely upon while living in the Facility. As long as the Facility is able to retain the current staff, there is no reason for the Facility to reduce its level of resident care. Approximately 90% of the current staff have been working at the Facility for more than 15 years. They are experienced, well trained, and familiar with the residents. The current cash flow is sufficient to maintain payroll and resident care related expenses.

**(v) Impact of the Cost of an Ombudsman on the Likelihood of a Successful Reorganization.** Clearly, the appointment of an ombudsman is unnecessary and will add an additional layer of administrative expense to this bankruptcy case. Section 333(b)(1) and (2) of the Bankruptcy Code requires an ombudsman to meet with and interview the residents of the Debtor's Facility, and report to the Court at least once every 60-days. Given the small number of residents, the level of scrutiny of the California Department of Social Services, the local CDA Ombudsman, as well as the history of exemplary care provided by the Debtor, the appointment of an ombudsman would only serve to duplicate the supervision of these government agencies at the expense of creditors. Moreover, section 333 (a)(2)(B) of the Bankruptcy Code provides that, if the ombudsman is appointed, the Office of the US Trustee may appoint a "California Long-Term Care Ombudsman" under State law. The Debtor is already monitored and supervised by an ombudsman with the CDA, and such an appointment would be redundant and unwarranted under the facts of this case.

///

///

WHEREFORE, the Debtor requests that the Court deny the appointment of an ombudsman in this case.

Dated: February 7, 2025

LAW OFFICES OF STUPPI & STUPPI

/s/ Sarah M. Stuppi
SARAH M. STUPPI
Attorneys for SAN FRANCISCO CARE CENTER, LP, Debtor-In-Possession
SAN FRANCISCO CARE CENTER, LP